IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Jan Creech, )<br><br>Plaintiff, )<br><br>vs. )<br><br>Michael J. Astrue, )<br>Commissioner of Social Security, )<br><br>Defendant. ) | Civil Action No. 6:08-989-GRA-WMC<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed applications for disability insurance benefits (DIB) and supplemental security income (SSI) benefits on December 23, 2004, respectively, alleging that she became unable to work on August 26, 2004. The applications were denied initially and on reconsideration by the Social Security Administration. On September 28, 2005, the

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

plaintiff requested a hearing. The administrative law judge, before whom the plaintiff, her attorney and a vocational expert appeared on May 10, 2007, considered the case *de novo*, and on June 28, 2007, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on January 25, 2008. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1)     The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

> (2)     The claimant has not engaged in substantial gainful activity since August 26, 2004, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq*., 416.920(b) and 416.971 *et seq*.).

> (3)     The claimant has the following severe impairments: degenerative disc disease, spondylosis and affective disorder (20 CFR 404.1520(c) and 416.920(c)).

> (4)     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

> (5)     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform work lifting or carrying 20 pounds occasionally and 10 pounds frequently; occasional pushing and pulling with the lower extremities; sitting and standing periodically to relieve discomfort; no climbing of ladders, ropes or scaffolds; no kneeling or crawling; occasional climbing of ramps and stairs; occasional balancing, stooping and crouching; avoidance of hazards [sic] work sites; and due to emotional difficulty as well as pain and medication side effects, she would be allowed to perform simple, routine work; work alone or with a small group of co-workers and she should avoid large crowds in the workplace.

(6)     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

(7)     The claimant was born on June 23, 1963 and was 41 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

(8)     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

(9)     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

(10)   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c)), 404.1566, 416.960(c), and 416.966).

(11)   The claimant has not been under a disability, as defined in the Social Security Act, from August 26, 2004 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.


**APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

3

impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff, who was born in June of 1963, was 41 years old at the time she allegedly became disabled and 44 years old at the time of the ALJ's decision. She completed high school, earned a two-year degree as a licensed practicing nurse (LPN), and took additional courses toward earning her registered nurse degree (Tr. 362). She worked as an LPN from 1990-2004 (Tr. 67). The plaintiff alleged she became disabled on August 26, 2004, due to back and neck problems and tremors (Tr. 72).

5

The record reveals that the plaintiff has a history of back and neck pain dating back to at least 2001. She underwent a series of diagnostic scans in 2002-2003, including magnetic resonance imaging (MRI), computerized tomography (CT) and x-rays. She received ongoing pain management care from Dr. Allen Sloan in the form of prescription medications and injections such as epidurals, facet spinal blocks, and sacroiliac (SI) joint injections from 2001 through 2007. The plaintiff sought routine medical care from family practitioner Dr. Cara Friez. Two state agency physicians examined and evaluated the plaintiff; one performed a physical examination and one performed a psychological evaluation.

An MRI on March 4, 2002, indicated degenerative disc changes at L4-L5 and L5-S1, accompanied by disc protrusion at those same levels (Tr. 314-315). Dr. John D. Steichen reviewed the MRI and found its results inconclusive (Tr. 299).

X-rays showed the lumbar spine to be normal other than narrowed L5-S1 disc space. Dr. Roger F. Bley, the reading physician, noted "no spondylolysis or spondylolisthesis" (Tr. 317).

On March 19, 2002, Dr. Wayne B. Sida of Piedmont Neurology Associates concluded that a electromyogram showed no evidence of peripheral neuropathy and that nearly all results were normal. He diagnosed an "acute L5 radiculopathy on right"(Tr. 306-07).

On April 1, 2002, Dr. Charles F. Colby reviewed the plaintiff's lumbar myelogram and CT scan and reported that they showed degenerative disc disease with superimposed degenerative osteoarthritis at L5-S1, with some evidence of mild nerve root impingement on the right L5 nerve root (Tr. 312-313). In reviewing this scan, Dr. Steichen indicated the scan was notable for no significant compression of neural elements and concluded that there was not a role for surgical intervention at this point (Tr. 298).

6

Subsequent to Dr. Steichen's conclusion that surgery was not appropriate, Dr. Franklin Epstein treated the plaintiff on April 17, 2002, by administering a series of spinal injections. He commented that the plaintiff "may someday need a L5-SI interbody fusion to separate the bony end plates and stabilize the spine. Since she is not at risk of neurologic damage now from direct pressure on her nerves, I would postpone any such treatment unless her pain becomes disabling" (Tr. 285).

The plaintiff underwent one additional MRI on June 5, 2003, at the Self Regional Medical Center. The physician administering the MRI concluded that the plaintiff's cervical spine was unremarkable other than a mild disc bulge at C5-6 without significant mass. The record contains no evidence of MRIs, CT scans, or x-rays which were conducted after the plaintiff's alleged onset date of August 26, 2004.

The plaintiff received ongoing care for her back and neck pain from the office of Dr. Allen L. Sloan, a specialist in anesthesiology and pain management. Dr. Sloan treated the plaintiff's back pain with prescription medication and pain-relieving injections, including epidurals and facet block injections. Dr. Sloan administered injections to the plaintiff on June 14, 2002 (Tr. 283); September 11, 2002 (Tr. 281); November 13, 2002 (Tr. 279); December 3, 2003 (Tr. 176-77); January 8, 2004 (Tr. 174-75); April 22, 2004 (Tr. 170); August 13, 2004 (Tr. 167-68); October 5, 2004 (Tr. 166); January 11, 2005 (Tr. 163); April 8, 2005 (Tr. 157); August 5, 2005 (Tr. 243-44); and December 31, 2005 (Tr. 237). At the time of each injection and often at follow-up visits, Dr. Sloan noted the excellent analgesic results of the injections and the fact that the plaintiff tolerated the procedures well (Tr. 155, 161-174, 226-246).

Dr. Sloan's treatment notes reflected an up-and-down trend in the plaintiff's condition, with markedly reduced pain and increased physical abilities following the injections. He documented improvements in her physical condition and pain, both prior to

7

and after the time she alleged disability onset.[2]  In August 2002, Dr. Sloan noted that the plaintiff had minimal pain complaints; in addition, she was more active and had better energy (Tr. 282).  In November 2002, he recorded that the November epidural relieved the plaintiff's back and leg pain a great deal (Tr. 279).  On January 8, 2004, the plaintiff had a better range of motion in the lumbar spine, improved gait, decreased palpable tenderness in her back, accompanied by decreased pain (Tr. 174).  Two months later, Dr. Sloan again reported an improved range of motion in her cervical spine (Tr. 173) and minimal pain on straight leg raising and lumbar palpation (Tr. 172).  In June 2004, the plaintiff was ambulatory with an improved gait and better range of motion in her lumbar spine (Tr. 169).  On May 9, 2005, Dr. Sloan reported that the plaintiff had an improved range of motion and decreased palpable tenderness since receiving an injection on April 8, 2005 (Tr. 155).  In November 2005, the plaintiff reported that the medication Lyrica improved the nerve pain in her legs (Tr. 240).

        Dr. Sloan also noted the improvements in the plaintiff's daily activities after receiving injections.  For example, on January 9, 2003, he wrote that "because of her injections and medications, she is able to work on a daily basis, taking care of herself and her family, and being fairly active" (Tr. 278).  On March 5, 2004, Dr. Sloan recorded the plaintiff's report that the injections and medications enabled her to continue working (Tr. 173).  After the plaintiff's alleged onset date, Dr. Sloan wrote that the plaintiff had had considerable relief from her low back pain since she was not working (Tr. 164, 12/3/04).  On May 9, 2005, his notes indicated that the plaintiff had not experienced extreme increases in pain since she stopped working (Tr. 155).  Further, her medications provided

---

[2]However, on other occasions, the plaintiff had documented tenderness to palpation, positive Patrick's sign (pain upon external rotation of the hip joint), pain on straight leg raising, and decreased range of motion (Tr. 229, 9/6/06; Tr. 230, 8/10/06; Tr. 231, 7/10/06; Tr. 232, 6/8/06; Tr. 233, 5/11/06; Tr. 234, 4/21/06; Tr. 236, 1/27/06; and Tr. 237, 12/13/05). This demonstrates the fluctuating pattern in the plaintiff's condition, with significant improvements following injections.

sufficient pain control to enable her to be fairly active and care for herself and family (Tr. 246). The plaintiff again reported on January 27, 2006, that the pain management techniques increased her functionality and allowed her to care for herself and family (Tr. 236). On October 3, 2006, Dr. Sloan documented that the plaintiff described her medications as providing good pain control and enabled her to take care of herself to a large degree (Tr. 228). On November 1, 2006, Angela Watkins, physician's assistant in Dr. Sloan's office, noted that the medications and injections improved the plaintiff's functionality (Tr. 227).

On March 6, 2007, Dr. Sloan summarized that the plaintiff had only moderate findings on her MRI and electromyogram (EMG) and did not have radiating pain (Tr. 254). Each time the plaintiff saw Dr. Sloan, he noted that she used medications appropriately and was not experiencing untoward side effects (*see e.g.* Tr. 156, 162, 167, 171, 174, 176, 228, 236, 245). On October 3, 2006, Dr. Sloan documented that the plaintiff's "morbid obesity remains unchanged" (Tr. 228). Previously, Dr. Sida also recorded that the plaintiff thought her weight might be playing a role in her low back pain (Tr. 308, 3/12/02).

From January 2004 to January 2005, the plaintiff sought routine treatment from family practitioner Dr. Cara Friez for conditions including acid reflux, elevated cholesterol, hypertension, migraine headaches, heart palpitations and depression (Tr. 136-46). Dr. Friez noted on multiple occasions that the plaintiff moved all extremities well (Tr. 138, 140, 146). Her records indicate that the plaintiff canceled or failed to keep re-check appointments at least three times (Tr. 138, 139, 140). On January 31, 2005, Julie Hammond, family nurse practitioner, noted that the plaintiff reported feeling better than she had in some time (Tr. 135). The plaintiff also sought treatment from the Greater Greenwood Medical Clinic on occasion, primarily for medication refills (Tr. 215-16).

On May 11, 2005, Debra Price, Ph.D., a state agency consultant, completed a psychiatric evaluation, concluding that the plaintiff did not meet any of the Listings. She

9

noted that the plaintiff could understand and remember simple instructions and was able to carry out simple tasks for two hours at a time without special supervision. She concluded that the plaintiff would not have an unacceptable number of work absences due to psychiatric symptoms. Dr. Price opined that the plaintiff could adapt to workplace changes, as well as recognize and avoid normal hazards. She noted that, while the plaintiff's symptoms are severe, they would not preclude her from carrying out basic work functions (Tr. 202-04).

At the request of the Commissioner, Dr. Dale Van Slooten, a state agency medical consultant, reviewed all evidence and evaluated the plaintiff's physical residual functional capacity on August 16, 2005. He concluded that the plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, and could stand or walk for six hours in an eight-hour day, as well as sit for six hours. He opined that the plaintiff's headaches, hypertension, tremors and cholesterol were medically treatable and not severe. He found that the plaintiff should limit climbing, stooping, and crouching to occasionally. Dr. Van Slooten concluded that the plaintiff had no manipulative, visual or communicative limitations. He noted that she should avoid hazards because of the safety issue when taking pain medication (Tr. 179-86).

On March 18, 2005, Dr. Frank Ferrell, state agency medical consultant, completed a physical residual functional capacity assessment, in which he noted that the plaintiff had received conservative treatment for back and neck pain. Like Dr. Van Slooten, he opined that the plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk for six hours in an eight-hour day, and sit for about six hours during an eight-hour day (Tr. 206-13).

David Massey, Ph.D., performed a mental status examination of the plaintiff at the request of the Commissioner on April 6, 2005. He documented that the plaintiff's daily activities included playing with her dogs and cats, performing chores, such as loading

10

the dishwasher, laundering clothes, sweeping and using a self-propelled vacuum. He noted that the plaintiff sometimes visited her mother. Dr. Massey diagnosed the plaintiff with major depression, adjustment disorder with anxiety, degenerative disc disease, hysterectomy, back pain, and frequent headaches (Tr. 151-53).

On February 28, 2005, Dr. Corey Hunt examined the plaintiff at the request of the Commissioner. During the physical exam, he noted that she "moves remarkably easily" at 5'4" and 215 pounds. The plaintiff indicated to Dr. Hunt that the main reason she could not work was because of pain in her legs. The plaintiff had negative straight leg raising when seated; when lying flat, she could bend her knees comfortably to 90 degrees but had discomfort at 45-50 degrees. Dr. Hunt noted good internal and external rotation of each hip. X-rays of the cervical spine showed good bony alignment and normal spine curvature, with mild to moderate arthritic changes in the spine. X-rays of the lumbosacral spine show pronounced curvature, good bony alignment and preservation of the joint spaces, except at L5-S1 which showed almost complete loss of the disc. Dr. Hunt concluded that the plaintiff had mild to moderate osteoarthritis in the cervical spine. He also diagnosed the plaintiff with chronic pain and severe depression, possibly associated with her degenerative disc disease (Tr. 148-50).

The plaintiff testified that her back and neck were her primary problems (Tr. 364); she also experienced tremors brought on by pain (Tr. 365). The plaintiff testified that she previously worked as a licensed practical nurse administering dialysis (Tr. 365). She testified that she regularly lifted patients between wheelchairs and dialysis treatment chairs (Tr. 367-68). The plaintiff testified that her back pain forced her to take medical leave beginning in August 2004; after one year of medical leave, her employer terminated her (Tr. 367). The plaintiff stated that her back hurt when she performed any physical activity, including sitting upright (Tr. 370-71). She testified that lying in bed relieved her pain (Tr. 371). She testified that she constantly wore a Duragesic patch and took Percocet, up to

11

twice per day as needed for pain relief (Tr. 373).  The plaintiff testified that she lived alone; her daughter helped with household chores, grocery shopping, and bills (Tr. 376).

The ALJ asked Feryal Jubran, a vocational expert, to assume a hypothetical person of the plaintiff's age, education level and work experience who could lift 10 pounds frequently and 20 pounds occasionally; must limit pushing or pulling with lower extremities to occasionally; needs to alternate periodically between siting or standing; must avoid climbing ladders, ropes or scaffolds; must avoid kneeling or crawling; must limit climbing ramps and stairs, balancing, stooping and crouching to occasionally; must avoid hazardous worksites; must avoid large crowds; and is limited to simple tasks (Tr. 382).  Dr. Jubran testified that such a person could work as an office helper,[3] stock checker,[4] and mail clerk.[5]

## ANALYSIS

The plaintiff alleges that she became disabled due back and neck problems and tremors on August 26, 2004.  She was 41 years old at the time she became disabled and 44 years old on the date of the ALJ's decision.  The ALJ found that the plaintiff's degenerative disc disease, spondylosis, and affective disorder were severe impairments, but determined that the plaintiff retained the residual functional capacity ("RFC") to perform jobs that exist in significant numbers in the national economy (Tr. 24).  The plaintiff argues that the ALJ erred by (1) failing to properly evaluate her RFC; (2) failing to properly consider the opinion of her treating physician; (3) failing to properly assess her credibility; and (4) accepting testimony from the vocational expert that contradicts Social Security Rulings.

---

[3]*Dictionary of Occupational Titles*, #239-567.010.

[4]*Dictionary of Occupational Titles*, # 299-667.014.

[5]*Dictionary of Occupational Titles*, #209-687.026.

*Residual Functional Capacity*

The plaintiff argues that the ALJ failed to properly assess her RFC. Specifically, the plaintiff argues that the ALJ failed to describe her maximum ability to perform certain work-related activities. The ALJ determined that the plaintiff had the RFC to perform work lifting or carrying 20 pounds occasionally and 10 pounds frequently; occasional pushing and pulling with the lower extremities; sitting and standing periodically to relieve discomfort; no climbing of ladders, ropes or scaffolds; no kneeling or crawling; occasional climbing of ramps and stairs; occasional balancing, stooping and crouching; avoidance of hazardous work sites; and due to emotional difficulty as well as pain and medication side effects, she would be allowed to perform simple, routine work; work alone or with a small group of co-workers and she should avoid large crowds in the workplace (Tr. 18-19).

> The Residual Functional Capacity ("RFC") assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work- related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved. . . .

SSR 96-8p, 1996 WL 374184, *7.

The ALJ failed to make any finding regarding how long the plaintiff can sit or stand during the workday. Further, the ALJ failed to state how often the plaintiff must alternate positions. The jobs identified by the vocational expert in response to the ALJ's hypothetical were all light jobs. The full range of light work "requires standing and walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10. As

13

argued by the plaintiff, the lack of findings as to how long she can sit or stand during the workday undermines the finding that she can do other work (pl. brief. 4).  Accordingly, upon remand, the ALJ should be instructed to "describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record."  *See* 96-8p.

The plaintiff also challenges the adequacy of the ALJ's review of her mental health records.  With regard to the plaintiff's mental RFC, the ALJ found that "due to emotional difficulty as well as pain and medication side effects, [the plaintiff] would be allowed to perform simple, routine work; work alone or with a small group of co-workers and she should avoid large crowds in the workplace" (Tr. 19).  In the body of the decision, the ALJ stated:

> I have evaluated the medical evidence concerning the claimant's mental disorder and find that such mental impairment creates a mild restriction of her activities of daily living, mild difficulties in maintaining social functioning and moderate deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner.

(Tr. 23).  The defendant argues that this finding was consistent with the only complete RFC assessment in the record – that of the state agency psychologist, Dr. Debra Price (Tr. 202-205).  However, Dr. Price found that the plaintiff had a mild restriction of activities of daily living, *moderate* difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace (Tr. 198) (emphasis added).  The ALJ does not discuss this opinion and fails to state why he found the plaintiff's limitations to be less severe than those found by the non-examining state agency psychologist.  Accordingly, upon remand, the ALJ should be instructed to explain his findings and the evidence relied upon in coming to his conclusions.

David Massey, Ph.D., performed a mental status examination of the plaintiff at the request of the Commissioner on April 6, 2005.  He documented that the plaintiff's

14

daily activities included playing with her dogs and cats, performing chores, such as loading the dishwasher, laundering clothes, sweeping and using a self-propelled vacuum. He noted that the plaintiff sometimes visited her mother. Dr. Massey diagnosed the plaintiff with major depression, adjustment disorder with anxiety, degenerative disc disease, hysterectomy, back pain, and frequent headaches (Tr. 151-53). The plaintiff argues that, contrary to Social Security regulations, Dr. Massey was not asked to provide an opinion as to the plaintiff's capacity for work-related functions. The defendant argues that while 20 C.F.R. §§ 404.1519n(c)(6) and 416.919n(c)(6) do provide that a complete consultative examination should include a statement about a claimant's work-related abilities, the regulations also provide that the agency may not require a report containing all the elements of a consultative examination listed in subsection (c) when the evidence does not require a complete consultative examination. *Id.* at §§ 404.1519n(d), 416.919n(d). Here, as argued by the plaintiff, an opinion as to her work-related abilities from an examining consultant would have certainly been helpful given that the only physician who offered any opinion as to the limitations caused by her mental impairments was a state agency non-examining physician. Upon remand, the ALJ should be directed to request such statement about the plaintiff's work-related abilities from Dr. Massey.

### Treating Physician

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 416.927(d)(2) (2006); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-2p. Furthermore, even if the plaintiff can produce

conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The regulations provide that even if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he still must consider the weight given to the physician's opinion by applying five factors: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 404.1527(d)(2)-(5). Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p, 1996 WL 374188, *5. As stated in Social Security Ruling 96-2p:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* 1996 WL 374188, *4.

Dr. Sloan, a treating physician, opined in January 2006 that the plaintiff retained the ability to perform only sedentary work (Tr. 247), while the state agency physicians indicated that the plaintiff was capable of medium work (Tr. 180, 207). The ALJ found in his decision:

> I have considered the opinion of Dr. Sloan that the claimant is capable of performing a reduced range of sedentary work with

> frequent absences from the workplace. Although his opinion is not given controlling weight, I have considered his opinion in the determination of the residual functional capacity. His assessment is not consistent with the treatment records or with the claimant's description of her daily activities and social functioning, as earlier discussed.

(Tr. 23). The ALJ identified specific medical notes by Dr. Sloan that were inconsistent with his opinion regarding the plaintiff's work abilities (Tr. 21-23). The ALJ also took into account the plaintiff's own testimony regarding her daily activities and pain, much of which Dr. Sloan recorded in his treatment notes. On these bases, the ALJ found Dr. Sloan's opinion inconsistent with other substantial evidence and declined to give his opinion controlling weight.

Specifically, the ALJ pointed to the inconsistencies between Dr. Sloan's opinions and his own treatment records, which indicated that the plaintiff had excellent results from the injections and that her pain medications provided effective relief, without side effects, in controlling her symptoms (Tr. 21-23, 155-56, 161-74, 176, 226-46). In a the questionnaire he completed on January 2, 2006, Dr. Sloan opined for the first time that the plaintiff would need to rest away from her work station and elevate her legs for more than an hour during an eight-hour work day (Tr. 247-49). Prior to this time, his treatment notes do not indicate that he ever told the plaintiff to elevate her legs. *See Bishop v. Barnhart*, 78 Fed.Appx. 265, 268 (4th Cir. 2003) (unpublished) (finding that failure of medical sources to place any restrictions on claimant's activities supports ALJ's decision of not disabled). Also, while Dr. Sloan indicated that the plaintiff could perform only sedentary work, his treatment notes indicate that the plaintiff reported being fairly active and caring for herself and family (Tr. 22, 246). Dr. Sloan recorded that the plaintiff had only moderate findings on her MRI and EMG, with no radiating pain (Tr. 22, 254). As the ALJ noted, these activity levels and moderate findings are inconsistent with Dr. Sloan's conclusions that the plaintiff is limited to sedentary work (Tr. 19-23).

17

The plaintiff asserts that the ALJ had a duty to re-contact the treating physician if his opinions were found inconsistent; however, as argued by the defendant, the plaintiff fails to note the introductory paragraphs of 20 C.F.R. §§ 404.1527(e) and 416.927(e), which indicate that the agency will seek additional information when the evidence from the treating source "inadequate for us to determine whether you are disabled." *Id.* §§ 404.1512(e), 416.912(e). *See Sultan v. Barnhart*, 368 F.3d 857, 863 (8th Cir. 2004) (holding that ALJ is required to recontact medical sources only if the available evidence does not provide an adequate basis for determining the merits of the disability claim); *Tadlock v. Astrue*, C.A. No. 8:06-3610-RBH, 2008 WL 628591, *8 (D.S.C. March 4, 2008) (holding not reversible error where ALJ did not recontact physician whose opinions were internally inconsistent); *Jackson v. Barnhart*, 368 F. Supp.2d 504, 508-509 (D.S.C. 2005) (holding ALJ had no duty to recontact treating physician where ALJ found objective medical evidence, including physician's own treatment records, wholly inconsistent with physician's opinion). In this case, the ALJ did not need additional information to make his finding of not disabled. Although inconsistent with his eventual conclusion, the information provided by Dr. Sloan regarding his assessment of the plaintiff was not inadequate; thus the Commissioner did not need to seek additional clarification from Dr. Sloan. The ALJ properly considered the factors in 20 C.F.R. §§ 404.1527(d) and 416.927(d) in according weight to the treating physician's opinion. The ALJ detailed Dr. Sloan's treatment dates from April 2004 through March 2007 and, in doing so, took into account the length of the treating relationship and nature and extent of the treatment relationship (Tr. 21-22). *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The ALJ's discussion of the inconsistencies between Dr. Sloan's opinions and his records showed consideration of the supportability and consistency factors (Tr. 21-23). *See id.* §§ 404.1527(d)(3) and (d)(4), 416.927(d)(3) and (d)(4). While the ALJ does not specifically discuss Dr. Sloan's specialization, the thorough discussion of Dr. Sloan's medical records indicates familiarity that would suggest

18

the ALJ considered his area of specialization in determining the weight given to Dr. Sloan's opinions (Tr. 21-23). As a whole, the ALJ's analysis of Dr. Sloan's medical records and treatment histories satisfies the requirement in sections 404.1527(d) and 416.927(d), for considering the weighting factors of medical opinions. The ALJ did not give Dr. Sloan's opinions controlling weight because they were inconsistent with his treatment records and the plaintiff's description of her daily activities (Tr. 23). Based upon the foregoing, the ALJ did not err in his analysis of Dr. Sloan's opinion.

### Credibility

The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the

evidence in the case record."  Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight."  SSR 96-7p, 1996 WL 374186, *4.

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)    the individual's daily activities;

(2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, *3.

The ALJ found that the plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms.  However, he further concluded, at the second step of the process, that the plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible.  The ALJ relied upon the medical evidence, the effectiveness and conservative nature of treatment, and the plaintiff's description of her pain and symptoms to make this conclusion (Tr. 22-23).  The medical evidence revealed that the plaintiff's treatment for back and neck pain had been

20

effective and conservative in nature (Tr. 22-23; *see* Tr. 208).  *See Gross v. Heckler,* 785 F.2d 1163,1165-66 (4th Cir. 1986) (holding that a condition is not disabling if medication or treatment reasonably controls the symptoms); *Robinson v. Sullivan*, 956 F.2d 836, 840 (8th Cir. 1992) (finding conservative treatment inconsistent with an allegation of disability).  The plaintiff's reports and medical records document that prescription medication controlled her pain relatively effectively (Tr. 22; *see* Tr. 246); and the plaintiff has not complained of untoward side effects from the medication (Tr. 21; *see* Tr. 156, 162, 167, 171, 174, 176, 228, 236, 245).  The plaintiff reported excellent results and relief from back pain following injections (Tr. 21-22; *see* Tr. 155, 161-174, 226-246).  The medical records document the plaintiff's frequent increases in daily activities following injections (Tr. 21-22; *see* Tr. 155, 164, 246).  The ALJ also recounted the medical evidence that the plaintiff had only moderate findings on her MRI and EMG diagnostic tests and no radiating pain (Tr. 22; *see* Tr. 254).

The plaintiff argues that the ALJ mischaracterized her treatment as "conservative" in nature because no physician recommended a surgery for her condition (pl. br. 32).  However, as argued by the defendant, the plaintiff's treatment was indeed conservative in that it did not involve surgery.  Prior to the time the plaintiff alleged disability, multiple doctors opined that if her pain were to become disabling, surgical measures should be considered (Tr. 285, 298).  Yet, the record reflects the plaintiff did not pursue or no doctor recommended surgery for her back pain.

The plaintiff also argues that the ALJ improperly required a physician's opinion that the plaintiff was totally and permanently disabled (pl. br. at 33).  However, the ALJ simply referred to the fact that the record was devoid of any medical opinion indicating that plaintiff was disabled as merely one fact in his credibility assessment (Tr. 23).  He does not emphasize this fact or in any way indicate that such an opinion is necessary; the ALJ simply considered this fact in assessing the plaintiff's statements regarding her symptoms and

impairments. The Commissioner, of course, may consider medical opinion evidence, or the lack of it, when making that determination. The Fourth Circuit has affirmed denial of benefits where no physician gave an opinion indicating claimant was totally disabled. *See Lee v. Sullivan*, 945 F.2d 687, 693 (4th Cir. 1991) (affirming ALJ holding that claimant was not disabled where none of claimant's doctors opined that claimant was disabled). Thus, the lack of any medical opinion supporting the plaintiff's assertion that she was disabled was an appropriate factor for the ALJ to consider in weighing her reported symptoms.

The ALJ also considered the plaintiff's daily activities and found them inconsistent with her allegation of disabling symptoms (Tr.21-23). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005) (accepting ALJ's assessment that routine activities were inconsistent with allegations of extreme pain); *Gross*, 785 F.2d at 1166 (upholding finding of no disability where claimant managed household, grocery shopped, cooked, washed dishes, and walked to town each day). In April 2005, the plaintiff reported that her daily activities included chores, such as loading the dishwasher, laundering clothes, sweeping, and using a self-propelled vacuum (Tr. 152). The plaintiff also indicated that she spent time playing with her dogs and cats (Tr. 152) and sometimes visited her mother (Tr. 153). Likewise, she reported to her physicians on multiple occasions that, primarily after injections, she was capable of caring for herself and her family (Tr. 227-28, 236, 246). Based upon the foregoing, the ALJ conducted the proper credibility analysis and cited substantial evidence to support his finding that the plaintiff's subjective complaints were not credible (Tr. 21-23).

### *Vocational Expert*

The ALJ asked Feryal Jubran, a vocational expert, to assume a hypothetical person of the plaintiff's age, education level and work experience who could lift 10 pounds frequently and 20 pounds occasionally; must limit pushing or pulling with lower extremities

to occasionally; needs to alternate periodically between siting or standing; must avoid climbing ladders, ropes or scaffolds; must avoid kneeling or crawling; must limit climbing ramps and stairs, balancing, stooping and crouching to occasionally; must avoid hazardous worksites; must avoid large crowds; and is limited to simple tasks (Tr. 382). The vocational expert responded that such an individual could perform the occupations of office helper, stock checker, and mail clerk (Tr. 382-83). She further testified to the number of these jobs available in the national and state economies (Tr. 383).

As discussed above, the plaintiff argues that the ALJ failed to make any findings regarding her maximum ability to stand and sit and the frequency she needed to alternate sitting and standing. The plaintiff further argues that the deficiencies in the ALJ's findings were incorporated into the hypothetical question to the vocational expert. This court agrees. "[I]n order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (citation omitted). Upon remand, the ALJ should be instructed to include all of the plaintiff's impairments, including her maximum ability to stand and sit and the frequency she needs to alternate sitting and standing, in the hypothetical question to the vocational expert.

## CONCLUSION AND RECOMMENDATION

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

April 21, 2009

Greenville, South Carolina

_____

WILLIAM M. CATOE
UNITED STATES MAGISTRATE JUDGE